# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 28 2016, 9:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Dale W. Arnett
Winchester, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of: K.K., N.K., and J.K., Minor Children, <br><br> and <br><br> D.K., Mother, <br> *Appellant-Respondent,* <br><br> v. | July 28, 2016 <br><br> Court of Appeals Case No. 68A04-1601-JT-54 <br><br> Appeal from the Randolph Circuit Court <br><br> The Honorable Jay L. Toney, Judge <br><br> Trial Court Cause Nos. 68C01-1507-JT-114, 68C01-1507-JT-115, and 68C01-1507-JT-116 |

Indiana Department of Child
Services,

*Appellee-Petitioner.*

**Najam, Judge.**

## Statement of the Case

D.K. ("Mother") appeals the trial court's termination of her parental rights over her minor children K.K., N.K., and J.K. (collectively "the Children"). Mother raises a single issue for our review, namely, whether the State presented sufficient evidence to support the termination of her parental rights. We affirm.

## Facts and Procedural History

Mother and D.K. ("Father") were married and had three children together, K.K., born July 1, 1999; N.K., born July 14, 2000; and J.K., born July 19, 2001. After Father died in 2011, Mother struggled to maintain the family home and raise the Children. In March 2014, Mother was arrested for "animal neglect" and spent four days in jail. Tr. at 116. The Indiana Department of Child Services ("DCS") removed the Children from Mother's home and placed them in foster care. At the time the Children were removed, the conditions of Mother's home were "deplorable." *Id.* at 117. "[E]verything [in the home] smelled of urine and cat and dog feces," and the Children "had feces in their

hair." *Id.* Educational assessments of K.K. and J.K.[1] revealed the following: then-fourteen-year-old K.K. was reading at "a kindergarten level" and could do "some basic addition and subtraction"; and then-twelve-year-old J.K. spoke in "gibberish," spoke "broken English" like one "might expect a 1 1/2- [to] 2-year-old to speak," did not know basic shapes, did not know the alphabet, and did not know any numbers. *Id.* at 39, 45.

[3]  On March 18, DCS filed petitions alleging that the Children were Children in Need of Services ("CHINS"). During the initial hearing on those petitions, Mother admitted that: "the home conditions were unsafe and unsanitary" for the Children; the Children had not been provided a proper education for the past two years;[2] the Children had not been seen by a doctor or dentist in "several years"; and the Children were dirty. State's Ex. 3. The trial court adjudicated the Children to be CHINS and ordered Mother to maintain suitable, safe, and stable housing; complete a parenting assessment; attend all scheduled visits with Children; and enroll and participate in any programs recommended by the family case manager ("FCM") or service provider. Mother's compliance with that dispositional order was inconsistent. Mother did not maintain stable housing or obtain employment; she "was not meeting"

---

[1]  N.K. did not undergo an initial educational assessment because, due to behavior issues, he was initially placed at the Youth Opportunity Center. In May 2014, N.K. began attending school and was placed in a classroom with a teacher who specialized in working with children with behavioral and emotional disabilities. N.K. "couldn't read first grade words" at that time. Tr. at 70.

[2]  The evidence shows that, when he was alive, Father had attempted to home-school the Children.

her goals in individual therapy, so it was discontinued; and she frequently canceled visitation with the Children.[3]

[4]     On July 8, 2015, DCS filed petitions to terminate Mother's parental rights to the Children. Following a hearing, the trial court granted those petitions. In support of its orders, the trial court entered the following findings and conclusions:[4]

> 7. At the time of removal, [the Children] resided in a trailer with [their] family.
> 8. The trailer was unsafe and unsanitary for [the Children] in that the home had multiple pets, there was pet feces throughout the home and on [the Children] and the home had a strong smell of urine and feces.
> 9. Prior to [the Children's] removal from Mother, [the Children] had been provided with virtually no education.
> 10. The lack of educational exposure resulted in [the Children] being significantly behind academically and socially.
> 11. [The Children] first attended school after being placed in licensed foster care in Hartford City, Indiana.
> 12. [The Children were] placed in [] grade[s] which w[ere] significantly below where [children] of the same age[s] would ordinarily be.
> 13. Prior to [the Children's] removal from Mother, [the Children] had been provided with virtually no medical care, had poor hygiene, significant dental issues and no immunizations.

---

[3] During one seven-month period of time, Mother canceled approximately 75% of visits with the Children.

[4] The trial court entered three separate orders, but, with the exception of the Children's identities, each order is worded the same.

14. Mother has cancelled a significant number of visitations with [the Children], which cancellations were traumatic for [the Children].

15. Mother has resided at multiple locations during the pendency of the underlying CHINS cause, and is now residing with a friend.

16. During the pendency of the underlying CHINS cause, Mother was provided with services to assist with acquiring and developing housing, budgeting, transportation, employment, acquiring and maintaining a source of income, as well as individual therapy and family therapy.

17. Family therapy was discontinued by the therapist after the therapist determined that family therapy would only be beneficial and appropriate once Mother established some sort of stability with housing, income, transportation, etc.

18. Beginning in March of 2014, Sherri Davis provided homemaker services to Mother, which involved providing assistance in acquiring and developing housing, budgeting, transportation and employment, among other things.

19. Ms. Davis worked with Mother between March of 2014, and April of 2015.

20. In April of 2015, Jonetta Stevens assumed case management services from her co-worker Sherri Davis.

21. Budgeting was a critical piece in most aspects of the services to be provided by Ms. Davis and Ms. Stevens in that an understanding of Mother's income and expenses would heavily impact the approach to things such as housing, employment and transportation.

22. Throughout the time that Ms. Davis and Ms. Stevens worked with Mother, Mother continued to represent that she was receiving government benefits of some sort, perhaps related to the death of her husband.

23. Despite several requests for documentation of any benefits, Mother never produced any verification that she had ever received any such benefits.

24. Mother may or may not have been receiving such government benefits, but any benefits she may have received at

one time, she was not receiving as of the date of the fact-finding hearing and had not been receiving since at least May of 2015.

25. Since the time of removal, Mother has not been employed.

26. Mother refused to work with Ms. Davis in searching for employment.

27. Until August of 2015, Mother had refused to work with Ms. Stevens in searching for employment.

28. Until August of 2015, Mother had refused to work with Ms. Davis or Ms. Stevens in applying for V.A. or other government benefits to which she may be entitled.

29. Despite repeated requests, Mother never provided any income documentation.

30. Until August of 2015, Mother had refused to work with Ms. Davis or Ms. Stevens in seeking government assisted housing.

31. Since the time of removal, Mother has never had a valid driver's license.

32. Mother resisted efforts of the service providers to assist her in obtaining a valid driver's license.

33. Since the time of removal, Mother has never had an operational vehicle.

34. Since the time of removal, the Department of Child Services and other service providers had provided many items of personal property, including beds, clothing and furniture.

35. As of the date of the fact-[f]inding, the Family Case Manager was unaware of where any of these items were.

36. That the Children's Advocate agrees that it is in the best interest of [the Children] to terminate the parental rights of Mother.

37. That Mother has not been able to remain current on her rent or house payment for any significant period of time since the outset of this case.

38. [The Children] desire to live with Mother.

39. Mother has made little to no progress in all areas during the pendency of the CHINS cause.

40. There is a reasonable probability that the conditions that resulted in [the Children's] removal and/or continued placement outside the home will not be remedied.

41. There is a reasonable probability that the continuation of the parent/child relationship[s] poses a threat to the well-being of [the Children].
42. Termination of the parent/child relationship[s] is in the best interest[s] of [the Children].
43. The Department of Child Services has a satisfactory plan for the care and treatment of [the Children], which includes adoption.

Appellant's App. at 6-9. This appeal ensued.

## Discussion and Decision

We begin our review of this appeal by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Family & Children (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cnty. Ofc. of Family & Children (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[6]     Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> > (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> \* \* \*
>
> (C) [and] that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).  That statute provides that DCS need establish only one of the requirements of subsection (b)(2)(B) before the trial court may terminate parental rights.  DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'"  *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[7]     When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses.  *Peterson v. Marion Cnty. Ofc. of Family & Children (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*.  Instead, we consider only the evidence and reasonable inferences that

are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Judy S. v. Noble Cnty. Ofc. of Family & Children (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999). *trans. denied*.

[8] Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Ofc. of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[9] Mother contends that the evidence is insufficient to support the trial court's findings underlying its conclusions that Mother will not remedy the conditions that resulted in the Children's removal; that the continuation of the parent-child relationships poses a threat to the well-being of the Children; and that termination is in the best interests of the Children. Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, we only address the sufficiency of the evidence to support the trial court's conclusions that continuation of the parent-child relationships poses a threat to the Children's

well-being and that termination is in the Children's best interests. And we address each of those contentions in turn.[5]

### *Continuation of the Parent-Child Relationships*

[10] Mother's entire argument with respect to this factor consists of the following:

> The trial court also erred in paragraph 41 of the orders by concluding there was a reasonable probability that the continuation of the parent child relationship poses a threat to the well-being of the children.
>
> There is no evidence anywhere that such a threat exists. All indicators are that the children are thriving and Mother has made a lot of progress.

Appellant's Br. at 9. Mother does not cite to either the record on appeal or case law in support of this contention. Accordingly, the issue is waived.

[11] Waiver notwithstanding, DCS presented ample evidence to support the trial court's conclusion that the continuation of the parent-child relationships poses a threat to the Children's well-being. A trial court need not wait until a child is irreversibly influenced by a deficient lifestyle such that his physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *Shupperd v. Miami Cnty. Div. of Family & Children (In re E.S.)*, 762

---

[5] Mother initially challenges the trial court's finding in paragraph 39 of the order, which stated that "Mother has made little to no progress in all areas during the pendency of the CHINS cause." Appellant's App. at 9. But Mother's contention on that issue amounts to a request that we reweigh the evidence, which we will not do. The evidence supports the trial court's finding in paragraph 39.

N.E.2d 1287, 1290 (Ind. Ct. App. 2002). When the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate. *Id.*

[12] The undisputed evidence shows that the Children were removed from Mother's care approximately sixteen months before DCS filed its petitions to terminate her parental rights. During the CHINS proceedings, Mother did not maintain stable housing; she did not consistently visit with the Children; individual therapy was discontinued because Mother was not meeting her goals; Mother did not seek employment despite assistance offered to her; and Mother refused to cooperate with case managers in an effort to come up with a budget. In short, Mother's compliance with the court's orders was very inconsistent.

[13] Further, Michlynn Gaddis, a therapist who had done individual therapy with the Children and who attempted individual therapy with Mother, testified at the evidentiary hearing that Mother

> has goals that she needs to meet that is going [sic] to provide a sense of security for these children, a sense of that [sic] they can be taken care of and that they know they're going to wake up and things are going to be consistent. Therapeutically, that has not happened.

Tr. at 162. And Sherri Davis, a FCM who had worked with Mother, testified that she did not believe that Mother had the ability, even with continued assistance, to take care of the Children's "great needs." *Id.* at 127-28. Davis described her work with Mother as "very frustrating" because "it seemed like

every step forward was three steps back." *Id.* at 128. Mother's contentions on appeal amount to a request that we reweigh the evidence, which we will not do. The trial court's findings support the trial court's conclusions that there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the Children's well-being.

### Best Interests

[14] In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 224 (Ind. Ct. App. 2010). "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*. "Additionally, a child's need for permanency is an important consideration in determining the best interests of a child, and the testimony of the service providers may support a finding that termination is in the child's best interests." *In re A.K.*, 924 N.E.2d at 224.

[15] Again, Mother has waived this issue for failure to present cogent argument. Waiver notwithstanding, Mother's contention amounts to a request that we reweigh the evidence, which we will not do. At the time of the evidentiary hearing, Mother was living with a friend and had not obtained her own home. Mother testified that she had submitted applications for employment, but she was still unemployed and had no stable income. Mother had just applied for

benefits through the Veterans Administration, but that application was pending at the time of the hearing. Finally, the trial court found that the Children's Court Appointed Special Advocate agreed that it is in the best interests of the Children to terminate Mother's parental rights, and Mother does not challenge that finding on appeal. The totality of the evidence, including Mother's historical inability to provide a safe and stable home and her refusal to take advantage of the resources DCS provided her during the CHINS proceedings, supports the trial court's conclusion that termination of parental rights is in the Children's best interests. The Children are thriving in foster care, and the plan for the Children is adoption. The trial court did not err when it terminated Mother's parental rights to the Children.

[16] Affirmed.

Baker, J., and Vaidik, J., concur.